USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS
 FOR THE FIRST CIRCUIT

 _________________________

No. 97-2046

 FRANCES DICHNER,

 Plaintiff, Appellee,

 v.

 LIBERTY TRAVEL, ET AL.,

 Defendants, Appellants.

 _________________________

 APPEAL FROM THE UNITED STATES DISTRICT COURT
 FOR THE DISTRICT OF MASSACHUSETTS

 [Hon. Richard G. Stearns, U.S. District Judge]

 _________________________

 Before

 Selya, Circuit Judge,

 Bownes, Senior Circuit Judge,

 and Stahl, Circuit Judge.

 _________________________

 James M. Andrews, with whom Douglas E. Edlin, Friedman &
Siegelbaum, LLP, Evan Slavitt, and Gadsby & Hannah, LLP were on
brief, for appellants.
 Betsy Ehrenberg, with whom Harold L. Lichten, and Pyle, Rome
& Lichten, P.C. were on brief, for appellee.

 _________________________

 April 13, 1998

 _________________________ SELYA, Circuit Judge. Frances Dichner suffers from post-
traumatic encephalopathy. Convinced that she had been refused
employment because of her disability, Dichner sued Liberty Travel
(Liberty) for violating both the Americans with Disabilities Act,
42 U.S.C. 12101-12213 (1994) (ADA), and Mass. Gen. Laws Ann. ch.
151B, 4 (West 1992) (Chapter 151B). A jury found that Liberty's
conduct transgressed the state (but not the federal)
antidiscrimination statute and awarded Dichner compensatory and
punitive damages. Liberty appeals. We affirm.
I. BACKGROUND
 We limn the facts in a light hospitable to the jury's
verdict, consistent with record support.
 Dichner, a resident of Danvers, Massachusetts,
experienced her first encephalopathic seizure in the summer of
1989, following an automobile accident. With medication, her
epilepsy-like condition metamorphosed from severe physical
convulsions to absence seizures trance-like states that render
one unable to respond to environmental stimuli for brief periods. 
At all times relevant hereto, Dichner's catalepsies occurred
infrequently, and, although her condition prevented her from
operating a motor vehicle, it did not significantly hinder her
ability to work.
 Prior to the accident, Dichner managed an employment
agency. During her convalescence, she toiled as an at-home
solicitor for several travel agencies, and, contemplating a
permanent career change, filled in as a sales agent for Saga
Holidays (a travel firm located in downtown Boston).
 In the spring of 1992, Dichner decided that she was ready
to return to work on a full-time basis. In response to a newspaper
advertisement, she contacted a Liberty recruiter who told her that
Liberty wished to hire sales agents for its offices in Boston and
on the North Shore (an area that includes Danvers). Her interest
piqued, Dichner attended a Liberty-sponsored open house where
company representatives distributed information about the firm,
collected resumes, and conducted preliminary interviews.
 Angelina Picini, the manager of Liberty's Danvers branch,
met informally with Dichner at the open house. Dichner explained
to Picini that she was interested in a career in travel, but that,
because of her disability, she preferred a job near her home. 
Picini assured Dichner that there was a position open in the
Danvers branch office and that her medical condition did not
present a problem. Picini then arranged for Dichner to have a
formal interview with Deborah Pickard (Liberty's regional manager).
 Dichner met with Pickard in Danvers. The two discussed
Dichner's previous experience in sales and travel. When Pickard
questioned Dichner about her desire to be stationed in Danvers,
Dichner explained that she did not drive. Pickard expressed
compunction about that restriction, noting that employees sometimes
were asked to go from branch to branch. In the end, however, she
assured Dichner that the limitation on her driving ability would
not impede her prospects for the Danvers opening. Despite this
assurance, Dichner learned a few days later that the position had
been filled.
 Dichner reapplied in 1993 after Liberty once again
announced the availability of employment opportunities on the North
Shore. At another Liberty open house, Picini, who had become the
manager of Liberty's Boston office, told Dichner that openings
existed in Danvers and arranged for her to interview again with
Pickard. Prior to this meeting, Dichner called Pickard and
confirmed that a sales position was available in Danvers.
 When Dichner arrived at Liberty's Danvers office for the
interview, Pickard asked Dichner whether her epileptic condition 
persisted. Dichner responded affirmatively, but noted that she was
on medication and that her seizures were under control. Pickard
continued down that road and, in Dichner's eyes, appeared
preoccupied with whether Dichner would be likely to undergo
seizures while on the job. In answer to Pickard's insistent
queries, Dichner explained that her seizures occurred rarely, that
they never had caused a problem in the workplace, and that she had
mentioned them only to explain her inability to drive. Pickard
seemed dissatisfied with these assurances and continued to express
concern for the "safety" of the branch.
 Pickard and Dichner talked briefly about Dichner's
qualifications and about the salary and benefits that Liberty
offered. When Pickard inquired about Dichner's interest in working
at other Liberty offices, Dichner responded that she was interested
only in Danvers. Pickard then suggested, for the first time, that
a Danvers position might not be available after all, and she
continued to voice concerns about Dichner's epilepsy ("I've seen
your type before, and I have to tell you, I'm not sure that this
isn't going to be a problem."). Dichner reacted angrily and
accused Pickard of acting unprofessionally by harping on the
disability without the slightest justification. Pickard responded
that, in her view, Dichner would not be a good fit for the company.
 Dichner departed in high dudgeon. She testified that she
became emotionally distraught, that she was unable to eat or sleep
for several weeks, and that she lost faith in her ability to
overcome her disability.
II. THE LITIGATION
 After touching the prescribed administrative bases, see42 U.S.C. 12117(a) (incorporating the exhaustion procedures
detailed at 42 U.S.C. 2000e-5); Mass. Gen. Laws. Ann. ch. 151B,
 9, Dichner sued Liberty in the federal district court. Her
complaint alleged that, by twice refusing to hire her on account of
her disability, Liberty violated both the ADA and Chapter 151B. 
Liberty denied the charges of discrimination. It asserted that it
had hired someone with significantly more experience in 1992, and
that there were no positions available in the Danvers office in the
spring of 1993. During a four-day jury trial, Dichner presented
evidence that Liberty's excuses were lame, including evidence
tending to show that several sales agents were hired for, or
transferred into, the Danvers office around the time of Dichner's
1993 interview.
 In his charge, Judge Stearns outlined the plaintiff's
four claims to the jury: disability discrimination in 1992 under
the ADA; disability discrimination in 1992 under Chapter 151B;
disability discrimination in 1993 under the ADA; and disability
discrimination in 1993 under Chapter 151B. He then explained that,
under both state and federal law, the plaintiff bore the burden of
establishing by a preponderance of the evidence that the defendant
had discriminated against her. Under either rubric, the judge
noted, the plaintiff had to make out a prima facie case of
discrimination and prove that the defendant's proffered reasons for
rejecting her application were pretextual. The court's
instructions made clear, however, that state and federal law
diverged with regard to the evidentiary effect of a finding of
pretext:
 Under Massachusetts law, Ms. Dichner is
 required to prove only the reasons Liberty has
 offered for its actions are untrue. If she
 persuades you that Liberty's explanation lacks
 credibility, you are permitted to draw the
 inference that the true reasons for Liberty's
 actions were discriminatory.
 . . .
 To prevail under federal law, Ms.
 Dichner must show something more, that is, not
 only that the explanation by Liberty is
 pretext, but that there is evidence of a
 discriminatory "plus" as well. In other
 words, Ms. Dichner must prove that Liberty's
 decision not to hire her was actually
 motivated by handicap discrimination.

Neither party objected to these portions of the charge.
 Judge Stearns further instructed that, if the jury found
Liberty liable under either state or federal law, it could award
both compensatory and punitive damages. The judge gave the
following instruction on punitive damages:
 Finally, if you find that the conduct
 of Liberty Travel was beyond the pale of the
 tolerable, you may award punitive damages to
 Ms. Dichner. These are damages not intended
 to compensate but to punish a defendant and to
 serve as a warning to other like-minded
 individuals or entities that society will not
 tolerate outrageous discriminatory behavior.
 Any sum that you award should be
 commensurate with your own conscience, the
 degree of reprehensibility of the defendants'
 conduct as you find it, the ratio of any
 punitive damages to the actual damages that
 you find Ms. Dichner incurred and the
 likelihood of the award's having a deterrent
 effect on both this and other potential
 defendants.

Liberty objected generally to the giving of a charge on punitive
damages, but interposed no specific objections to the phraseology
that the judge employed.
 Judge Stearns submitted the case to the jury by means of
a special verdict form tailored to the resolution of Dichner's four
claims. Using this matrix, the jury found for the plaintiff with
regard to the claim that Liberty discriminated against her in 1993
within the meaning of Chapter 151B, and awarded her $10,000 in
compensatory damages and $75,000 in punitive damages. The jury
found for Liberty on the three remaining claims. Judge Stearns
denied Liberty's post-trial motions.
 On appeal, Liberty spins several lines of argument. To
the extent that these asseverations implicate the jury's liability
finding, we treat them in the ensemble. We then address Liberty's
complaint that an award of punitive damages is inappropriate.
III. THE FINDING OF LIABILITY
 Stripping away the layers of rhetorical excess that
encase its arguments, Liberty's assault on the liability finding
comprises three main forays: (a) that the jury returned an
internally inconsistent verdict; (b) that the verdict offends
principles of due process; and (c) that an erroneous set of jury
instructions caused the problem. We treat these assertions
sequentially.
 A
 The special verdict form used, without objection, by
Judge Stearns required the jury to make separate findings anent
Dichner's federal and state claims. Pointing out that those claims
were based upon substantively analogous statutes, Liberty argues
that the jury's verdict finding Liberty liable under state, but
not federal, law is irreconcilably inconsistent. Liberty's
argument is overly simplistic. Notwithstanding the affinity that
exists between the ADA and Chapter 151B in the employment arena,
the two statutes utilize different evidentiary standards in their
implementation of a common burden-shifting framework. This
discrepancy fully explains how conduct rationally can be found to
violate state, but not federal, law.
 Under Massachusetts law, as under federal law, a
plaintiff who lacks direct evidence of discrimination may proceed
by engaging the three-stage order of proof articulated by the
Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792,
802-05 (1973). Under that model, a plaintiff who suffers from a
disability makes out a prima facie case of employment
discrimination by demonstrating that she is a member of a protected
group who has been denied an employment opportunity for which she
was otherwise qualified. See Christopher v. Adam's Mark Hotels,
___ F.3d ___, ___ (8th Cir. 1998) [1998 WL 92202, at *2]; Lattimorev. Polaroid Corp,, 99 F.3d 456, 465 (1st Cir. 1996). Such a
showing gives rise to an inference that the employer discriminated
due to the plaintiff's disability and places upon the employer the
burden of articulating a legitimate, nondiscriminatory reason for
the adverse employment decision. See Cumpiano v. Banco Santander
P.R., 902 F.2d 148, 153 (1st Cir. 1990). This entails only a
burden of production, not a burden of persuasion; the task of
proving discrimination remains the plaintiff's at all times. SeeTexas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 253, 256
(1981). Once such a reason emerges, the inference raised by the
prima facie case dissolves, see Mesnick v. General Elec. Co., 950
F.2d 816, 823 (1st Cir. 1991), and the plaintiff is required to
show, unaided by the original inference of discrimination, that the
employer's proffered reason is a pretext for discrimination. SeeFurnco Constr. Corp. v. Waters, 438 U.S. 567, 578 (1978); McDonnell
Douglas, 411 U.S. at 805.
 To this point, the federal and state paradigms are
substantially identical. At the proof-of-pretext stage, however,
there is a critical difference. To prevail under federal law, it
is insufficient for a plaintiff merely to undermine the veracity of
the employer's proffered justification; instead, she must muster
proof that enables a factfinder rationally to conclude that the
stated reason behind the adverse employment decision is not only a
sham, but a sham intended to cover up the proscribed type of
discrimination. See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502,
515 (1993); Smith v. Stratus Computer, Inc., 40 F.3d 11, 16 (1st
Cir. 1994); Woods v. Friction Materials, Inc., 30 F.3d 255, 260
(1st Cir. 1994). This "pretext plus" approach does not necessarily
require the introduction of additional evidence. Although a
plaintiff must show "both that the employer's articulated reason is
false, and that discrimination was the actual reason for its
employment action," Woods, 30 F.3d at 260, the Supreme Court's
decision in Hicks leaves open the possibility that "[w]hen the
prima facie case is very strong and disbelief of the proffered
reason provides cause to believe that the employer was motivated by
a discriminatory purpose, proof of pretext [alone] 'may' be
sufficient." Lattimore, 99 F.3d at 465 (quoting Hicks, 509 U.S. at
511).
 Massachusetts eschews the federal "pretext plus" approach
in favor of a "pretext only" approach. Under Chapter 151B, a
plaintiff who is seeking to establish a violation of the
Massachusetts statute can prevail as long as she proves that the
defendant's stated reasons for its employment decision are
pretextual. See Blare v. Husky Injection Molding Sys., 419 Mass.
437, 444-45, 646 N.E.2d 111, 117 (1995). To the extent that the
Massachusetts version of the McDonnell Douglas model takes a
"pretext only" approach to proof of discrimination, federal and
state law diverge. See Lattimore, 99 F.3d at 465.
 In light of this salient distinction between the federal
and state schemes, painstakingly explicated in Judge Stearns's
charge, the jury in this case reasonably could have found as
indeed it did that Dichner proved her case under Chapter 151B but
not under the ADA. See, e.g., id. at 467-68 (concluding that there
was evidence to support a finding of pretext but not enough to
establish pretext plus). We think it elementary that, when a
plaintiff must meet distinct evidentiary standards to prevail on
separate claims, a jury warrantably can find for the plaintiff on
one and against her on the other. Liberty's inconsistency argument
is therefore unpersuasive.
 B The defendant further asserts that the split verdict in
this case offends accepted tenets of substantive due process. This
assertion rests on the premise that because the jury found in
Liberty's favor on the ADA claim, it did not detect a
discriminatory animus, and thus, holding Liberty liable for
discrimination against Dichner on any theory violates due process. 
This is an attack, pure and simple, on the constitutionality of the
Massachusetts pretext only rule, which, as Liberty self-
interestedly sees it, permitted the "jury to find that Liberty
Travel violated an anti-discrimination statute without finding that
Liberty Travel actually discriminated against the plaintiff,"
Appellant's Reply Brief at 23, and which, in the bargain, punishes
Liberty for doing "what the law plainly allows it to do." Id.(quoting Bordenkircher v. Hayes, 434 U.S. 357, 363 (1977)).
 The record discloses no sign that Liberty advanced this
constitutional harangue below, and we could reject it on that basis
alone. See Daigle v. Maine Med. Ctr., Inc., 14 F.3d 684, 687-88
(1st Cir. 1994) (collecting cases and applying raise-or-waive rule
to omitted constitutional challenges). We address the argument
briefly, however, because it is readily evident that Liberty
misunderstands the evidentiary effect of a finding of pretext under
state law.
 The verdict on the ADA count is not, as Liberty would
have it, an affirmative determination that Liberty manifested no
discriminatory intent. To the contrary, the court instructed the
jury to measure the corpus of evidence by two different evidentiary
standards, both aimed at determining whether Liberty discriminated
against Dichner on the basis of her disability. Properly
understood, the verdict denotes that, although the proof fell short
when evaluated by reference to one such standard (pretext plus),
the same proof, when evaluated by reference to the other standard
(pretext only), enabled the jury to infer that Liberty had the
requisite discriminatory animus and had committed a discriminatory
refusal to hire. This finding supportable on the facts and the
law belies Liberty's foundational premise.
 Liberty offers no authority to show that use of the state
pretext only standard is constitutionally suspect, or, put another
way, that use of the federal pretext plus standard as a means of
gauging discriminatory intent is constitutionally mandated. In all
events, we believe that such a proposition is wholly untenable. 
See generally St. Mary's Honor Ctr., 509 U.S. at 533-43 (Souter,
J., dissenting) (questioning, on behalf of four Justices, the
fairness and viability of the pretext plus approach); D. Don Welch,
Removing Discriminatory Barriers: Basing Disparate Treatment
Analysis on Motive Rather Than Intent, 60 S. Cal. L. Rev. 733, 759-
63 (1987) (concluding that discriminatory purpose is not a
prerequisite to liability under Title VII). That ties the ribbon
on the package. Since constitutionally acceptable Massachusetts
jurisprudence enables a factfinder to infer intentional
discrimination solely from a showing of pretext, state law does not
"plainly allow[]" Liberty to act as it did in Dichner's case. 
Consequently, there was nothing fundamentally unfair, in the
substantive due process sense, about the jury's verdict on the
Chapter 151B claim.
 C
 Liberty's next strike is waged in the name of federal
supremacy. If the plaintiff's evidentiary burden differs in regard
to state and federal discrimination claims, this thesis runs, then
a trial court should instruct the jury to apply the federal
standard to both claims because federal law is paramount, see U.S.
Const. art. VI, and in all events, federal procedure is applicable
to state-law claims that are litigated in federal courts, see Hannav. Plumer, 380 U.S. 460, 465 (1965) (explaining that when state
causes of action are litigated in a federal forum, "federal courts
are to apply state substantive law and federal procedural law"
under the aegis of Erie R. Co. v. Tompkins, 304 U.S. 64 (1938)).
 Liberty's indignation over this alleged affront to
federal supremacy is long overdue. It did not object when Judge
Stearns instructed the jury to apply the pretext only standard to
Dichner's Chapter 151B claim and the pretext plus standard to her
ADA claim. The failure to object to jury instructions in the 
manner prescribed by Fed. R. Civ. P. 51 (requiring objections to be
made "before the jury retires to consider its verdict") forfeits
claims of error in respect to the content of those instructions. 
See Elliott v. S.D. Warren Co., 134 F.3d 1, 6 (1st Cir. 1998). 
Hence, the objection that Liberty now lodges is by the boards.
 To be sure, an appellate court retains the power to act,
even in the absence of a contemporaneous objection, if the
belatedly challenged jury instruction sinks to the depths of plain
error. See id. Here, however, we discern no error, plain or
otherwise. Federal courts often utilize divergent standards of
proof for claims brought by a plaintiff under parallel federal 
and state discrimination statutes. See, e.g.,Lattimore, 99 F.3d at
467; Forsythe v. Microtouch Sys., Inc., 945 F. Supp. 350, 356-57
(D. Mass. 1996); Terry v. Electronic Data Sys. Corp., 940 F. Supp.
378, 383-84 (D. Mass. 1996). As a general proposition, such
duality does not signify a direct conflict between federal and
state law, nor does it offend principles of federal supremacy. SeeEllenwood v. Exxon Shipping Co., 984 F.2d 1270, 1276 (1st Cir.
1993) ("In the employment discrimination field, Congressional
enactments 'have long evinced a general intent to accord parallel
or overlapping remedies against discrimination.'") (quoting
Alexander v. Gardner-Denver Co., 415 U.S. 36, 47 (1974)). This
verity rings particularly true in disability discrimination cases,
for the ADA anticipates that disabled persons will enjoy the full
protection of both federal and state antidiscrimination schemes. 
See 42 U.S.C. 12201(b) (assuring that the ADA does not "limit the
remedies, rights, and procedures of any . . . law of any State . .
. that provides greater or equal protection for the rights of
individuals with disabilities"). Because the federal standard
(pretext plus) applies to the federal cause of action (the ADA
claim) and the state standard (pretext only) applies to the state
cause of action (the Chapter 151B claim), they can coexist
peacefully.
 Liberty's related contention that Erie principles compel
the application of the federal pretext plus standard to Dichner's
Chapter 151B claim is similarly unavailing. The pretext
only/pretext plus dichotomy hinges on the evidentiary impact of a
showing of pretext. At its axis, this dichotomy involves an issue
of substance that should be decided by reference to state law
where, as here, the underlying cause of action derives from state
law. See, e.g., Elliott, 134 F.3d at 5 ("Generally, in diversity
cases the evidentiary effect accorded the violation of a safety
rule is a matter of state law."); Oja v. Howmedica, Inc., 111 F.3d
782, 792 (10th Cir. 1997) (concluding that, as to causes of action
arising under state law, a federal court usually "examine[s] the
evidence in terms of the underlying burden of proof as dictated by
state law"); Daigle, 14 F.3d at 689 (approving the district court's
use of a Maine statute's evidentiary provisions in a diversity
case). Consonant with these authorities, we hold that the court
below did not err in applying Massachusetts's pretext only standard
to the Chapter 151B claim.

IV. THE AWARD OF PUNITIVE DAMAGES
 Liberty maintains that Judge Stearns should not have
permitted the jury to assess punitive damages because the record
affords no basis for such redress. We do not agree.
 A We begin with a modest lesson on the applicable legal
framework. Under a federal antidiscrimination statute that
provides for punitive damages (like the ADA), a jury may be allowed
to assess such damages "when the defendant's conduct is shown to be
motivated by evil motive or intent, or when it involves reckless or
callous indifference to the federally protected rights of others." 
Smith v. Wade, 461 U.S. 30, 56 (1983); see also BMW of N. Am., Inc.v. Gore, 116 S. Ct. 1589, 1599 (1996). Chapter 151B also
authorizes a plaintiff to recover punitive damages, but the
Massachusetts statute does not specify the types of situations in
which such damages are appropriate.
 The commonwealth's highest court recently interpreted
Chapter 151B to allow for punitive damages under the circumstances
provided by the Restatement (Second) of Torts 908(2) (1979), that
is, when the defendant's conduct "is outrageous, because of [his]
evil motive or his reckless indifference to the rights of others." 
Dartt v. Browning-Ferris Indus., ___ N.E.2d ___, ___ (Mass
1998)[1988 WL 81234, at *8] (internal quotation marks omitted); seealso Bain v. City of Springfield, 768 N.E.2d 155, 161-62 (1997)
(indicating that such damages are available "where the defendant's
conduct warrants condemnation and deterrence"); Dalis v. Buyer
Adver., Inc.,636 N.E.2d 212, 215 (1994) (reserving punitives for
"egregious" cases). Although the federal standard also reflects
Restatement principles, see, e.g., Smith, 461 U.S. at 53-54, courts
cannot automatically assume that punitive damages are available
under Chapter 151B on the same basis as they are available to a
plaintiff in a federal discrimination case. See August v. Offices
Unlimited, Inc., 981 F.2d 576, 580 n.3 (1st Cir. 1992) ("In
interpreting Massachusetts discrimination statutes, Massachusetts
courts may look to the interpretations of analogous federal
statutes, but [they] are not bound thereby."); Dartt, ___ N.E.2d at
___ [1998 WL 81234, at *8].
 In this instance, neither party suggested the existence
of a distinction between federal and state standards for the award
of punitive damages, and Judge Stearns therefore used a formulation
drawn strictly from federal precedents in his jury instructions. 
Neither party objected to the substance of this instruction and, on
appeal, the parties agree that its content should govern the
question of whether punitive damages were appropriately awarded
here. Under the circumstances, we acquiesce in the parties' shared
position and proceed on the assumption, arguendo, that there is no
material difference between the federal and state standards (an
assumption which, in light of Dartt, appears quite reasonable).
 B
 Liberty asserts that, because the jury found only
pretext, not pretext plus, it could not have acted with the evil
motive or intent that the federal standard for exemplary damages
requires. This assertion is not unlike Liberty's due process
argument, see supra Part III(B), and suffers the same fate. A jury
need not find some special sort of malign purpose in order to exact
punitive damages in a disparate treatment case because the "intent"
that is necessary to undergird an award of punitive damages in such
a case is the same "intent" that is required for a finding of
discrimination in the first place. See Rowlett v. Anheuser-Busch,
Inc., 832 F.2d 194, 205 (1st Cir. 1987) (recognizing that "the
state of mind necessary to trigger liability for the wrong is at
least as culpable as that required to make punitive damages
applicable"). The Rowlett panel specifically rejected an assertion
that "something more than intentional discrimination [as proven via
the McDonnell Douglas framework] is necessary," id., holding
instead that, once intentional discrimination has been established,
whether directly or by a McDonnell Douglas inference, the jury, in
order "'to punish [the defendant] for his outrageous conduct and to
deter him and others like him from similar conduct in the future,'"
has the authority to award punitive damages in "its 'discretionary
moral judgment.'" Id. at 205, 206 (quoting Smith, 461 U.S. at 52,
54).
 Here, the record contains evidence which, if viewed in
the light most amenable to the verdict, reflects egregious conduct,
worthy of condemnation and crying out for deterrence. In addition,
the jury supportably found that Liberty had committed intentional
discrimination as that concept is defined under Massachusetts law
and chose to award punitive damages, apparently, in the words of
the court's charge, "to punish the defendant and to serve as a
warning to other like-minded individuals or entities that society
will not tolerate outrageous discriminatory behavior." In these
circumstances, Rowlett controls. Since the law and the facts
sufficiently support the jury's "discretionary moral judgment,"
Smith, 461 U.S. at 52, we are not at liberty to disturb the award.
V. CONCLUSION
 We need go no further. Liberty raises other arguments,
but all of them are patently unmeritorious. In closing, it
suffices to say that the challenged verdict draws its essence from
a correct statement of the law reflecting the proper balance
between federal and state "pretext" policy in discrimination cases. 
Because the jury struck this balance in an acceptable manner and
appropriately awarded punitive damages, the judgment below must be

Affirmed. Costs in favor of plaintiff-appellee.